IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 22, 2018 Session

**KIM RENAE NELSON v. LORING E. JUSTICE**

**Appeal from the Juvenile Court for Roane County**
**No. 16002      Don R. Ash, Senior Judge**

_____

**No. E2017-00895-COA-R3-CV**

_____

A mother filed a complaint seeking to establish paternity. After years of litigation, the trial court established paternity and designated mother as the primary residential parent. The trial court determined that the father engaged in conduct that necessitated limiting his residential parenting time with the child. As a result, the trial court fashioned a residential parenting schedule that severely restricted the father's parenting time, and the father appealed. We affirm the trial court's judgment in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Linn M. Guerrero Justice and B. Chadwick Rickman, Knoxville, Tennessee, for the appellant, Loring E. Justice.

Cecilia Petersen, Lynn C. Peterson, and David Lawrence Valone, Knoxville, Tennessee, and Martha Meares, Maryville, Tennessee, for the appellee, Kim Renae Nelson.

**OPINION**

I. FACTUAL AND PROCEDURAL BACKGROUND

This case involves a protracted and bitter custody dispute. The minor child at issue, Noah Nelson, was born in February 2005 to Kim Renae Nelson ("Mother") and Loring E. Justice ("Father"). Mother and Father were never married, and their three-year relationship ended shortly after they learned of the pregnancy in the summer of 2004. Mother is an attorney employed as the public defender for Roane County. Father is a self-employed attorney.

On July 29, 2004, Mother filed a complaint against Father to establish paternity and to obtain child support, prenatal and birthing expenses, attorney's fees, and a temporary restraining order. The trial court issued a temporary restraining order that day prohibiting Father "from coming about or contacting" Mother. In response to Father's motion for a more definite statement, Mother filed an amended complaint on September 24, 2004, vividly detailing allegations of rape and erratic behavior by Father.[1] Father filed an answer and counter-complaint seeking an order of parentage recognizing him as Noah's legal father, directing that the child's surname be changed to "Justice," awarding him "the sole and exclusive, care custody and control" of the child, and ordering Mother to pay child support.

The trial court entered a temporary order on July 16, 2005, granting Father parenting time "every Tuesday, Thursday, and Sunday afternoon from 2:00 to 5:00 p.m." and ordering him to pay $871 per month in child support. Additionally, the court ordered that the paternal grandmother accompany Father to the custody exchanges and that she remain with him while he exercised his parenting time with the child. On August 11, 2006, the trial court entered a second temporary order modifying Father's parenting time. The court removed the requirement that the paternal grandmother be present during Father's parenting time and provided Father parenting time overnight "[e]very Tuesday at 2:00 p.m. until the following Wednesday at 2:00 p.m." The order further provided Father parenting time "[e]very Thursday and Sunday from 2:00 p.m. to 6:00 p.m."

The case remained hotly contested until April 2007. After Father took Mother's deposition in April 2007, there was a ceasefire in the litigation and the case went dormant for several years. During most of this dormant period, the parties followed the parenting schedule provided in the August 11, 2006 temporary order. Once Noah started school in 2010, however, it became necessary to modify the parenting schedule to provide Father parenting time when Noah was not in school.

Mother prepared an agreed permanent parenting plan that provided Father with 109 days of parenting time per year. This plan became known as the 2010 parenting plan. Pursuant to this plan, Father had the majority of his parenting time every "Tuesday at 5:00 p.m. to Wednesday morning beginning of school"[2] and every other week from

---

[1] Mother alleged in her amended complaint that, while she and Father were on vacation in Italy in June 2004, Father threatened to "beat the sh** out of [her]" after she refused to marry him. Mother fled their hotel room while Father checked his e-mail messages in the lobby of the hotel, and she spent the remainder of the night hiding in the stairwell. Upon returning to their room the next morning, she noticed clothes soaking in the bathtub. Mother alleged that, after she inquired about the clothes, Father angrily explained that he had a fecal incident due to receiving an upsetting e-mail. When Mother asked why some of her clothes were in the bathtub, he responded, "[I]f my clothes have to soak in sh** then so do yours."

[2] Father had parenting time with the child every Tuesday from 5:00 p.m. until Wednesday at 5:00 p.m. during the summer.

Friday at 6:00 p.m. until Sunday at 6:00 p.m. Additionally, this plan provided that both parents, after providing 45 days written notice, "may elect to have five (5) consecutive days with the child for a vacation" each summer. Father refused to sign the 2010 parenting plan, but he and Mother followed the parenting schedule provided in the plan for approximately three years.

Although the case had gone dormant, there was no easing of tensions between the parties, and their already strained relationship further deteriorated in 2011. Mother attended one of Noah's basketball games with her boyfriend, Robert Bodine, in late January. They noticed Father and his mother sitting in a different section of the gymnasium. At one point during the game, Mr. Bodine went to the section where Father and his mother were and sat behind them; Mr. Bodine did not speak to them. Mother and Mr. Bodine, while standing outside the gymnasium after the game, observed Father and his mother get in their car to leave. As Father drove by, Mr. Bodine made an obscene gesture involving the middle finger.

Several months later, Noah was diagnosed with strep throat. He was given an antibiotic and Mother dropped him off at the paternal grandmother's home for Father's parenting time. She informed Father of Noah's diagnosis and that the doctor said Noah could go to school the next day. She stressed that Noah really wanted to attend school the next day because it was the last day of the school year and he would find out who his teacher was for the following school year. Mother called the school the following morning and learned that Father had not taken Noah to school. Shortly thereafter, accompanied by a police officer, Mother went to the paternal grandmother's home to retrieve Noah and take him to school. She took him to school long enough to learn who his next teacher would be and then returned him to the paternal grandmother's home for the remainder of Father's parenting time.

In the late summer of 2012, Mother married Mr. Bodine, and Noah accompanied them on their honeymoon. Mother notified Father of the dates of the vacation earlier in the summer as required by the 2010 parenting plan, and she believed that he did not have a problem with her taking Noah during those days. Unfortunately, Father did have a problem with Mother taking Noah on vacation for those days because Noah missed one day of parenting time with Father. While Mother was on her honeymoon, Father informed her that they would "have to return to court," and he reinitiated this case the day after she returned home by noticing her for a second deposition. In the following months, Father filed numerous pleadings in this case and filed two separate law suits against Mother: one against her and Mr. Bodine regarding the obscene gesture Mr. Bodine made at Father following Noah's basketball game and another against Mother to remove her from her position as the court clerk of Roane County,[3] accusing her of extortion and

---

[3] Mother was the court clerk of Roane County before she became the public defender of Roane County.

witness intimidation because she threatened to disseminate a document that could cause harm to Father.

Noah began experiencing anxiety about visits with Father and school personnel witnessed his anxiety at the beginning of the school year in August 2013. On the morning of one incident, Father took Noah to school after exercising overnight visitation. Noah began crying after Father left. He explained to school personnel that he was upset because Father had yelled at him. When the principal called Mother, she went to the school to console Noah. Noah calmed down enough to go to class after speaking with Mother.

Following this incident, Mother filed an emergency motion to suspend Father's parenting time. She alleged that she took Noah to see psychologist Dr. Vey Nordquist due to her concerns "about the child's well-being and state of mind because of comments made by the child after his visits with his Father." She attached to her motion the affidavit of Dr. Nordquist, recommending that Father's visits be limited to a weekly two-hour supervised visit "in a safe setting where Noah does not feel that he has to act out a role in order to placate his father's wishes." After hearing Mother's motion, the trial court entered an order on September 13, 2013, finding it was in Noah's best interest that Father's parenting time be restricted to two hours of supervised visitation per week at a facility called Parent Place. The court based its decision, in large part, on the incident at school and the testimony of Dr. Nordquist.

There was a delay in arranging supervised visits at Parent Place following entry of the September 13, 2013 order. In the interim, Father exercised his weekly two hours of supervised parenting time at the McDonald's in Kingston, Tennessee. Charlotte and William Hazelwood, Mother's mother and step-father, supervised these visits. Father and his girlfriend, Linn Guerrero, often recorded the visits at McDonald's, using cameras that were hidden in items such as pens, eye glasses, and drinking glasses. Noah discovered that Father was secretly recording the visits and requested that the maternal grandmother alert him if she saw Father activate one of the cameras. During one of the visits at McDonald's, Father activated a camera and the maternal grandmother signaled Noah by nudging him with her foot. Father observed this and reported the maternal grandmother to the Department of Children's Services ("DCS" or "the Department") for abuse, alleging she kicked Noah. The Department investigated the incident and found no evidence of abuse. During another visit at McDonald's, Father's associate, Chadwick Rickman, served the maternal grandmother with a notice for a deposition in Noah's presence.

Following a lengthy period of discovery, the case finally made it to trial. The trial court heard the matter over the course of nearly two years on the following twenty-two days: May 11-14, 2015; September 21-26, 2015; December 21-24, 2015; August 8-11, 2016; February 21-22, 2017; and March 29-30, 2017. A significant amount of the

- 4 -

evidence presented at trial concerned whether or not the problems in Father's relationship with Noah were the result of a campaign by Mother to alienate Noah from Father.

*Lay Witness Testimony*

Mother's proof focused on establishing that Father's own actions caused the problems in his relationship with Noah. Kelly Ross, Father's ex-wife, testified on behalf of Mother. Ms. Ross married Father in 2009, and they were married for approximately two years. She testified in regard to Father's history of controlling and abusive behavior. Ms. Ross stated that she endured "berating, emotional, sexual, [and] physical . . . abuse" while married to Father. He isolated her and made her feel ashamed to be around her family by telling her that they would be disappointed by all of the things she had done in her life. While she was pregnant with their child, he had her write a confession detailing all of the wrongs she allegedly committed prior to their marriage, such as kissing another man. In Ms. Ross's written confession, Father also had her write that she relinquished her parental rights to the unborn child because she deceived Father about her alleged wrongs and because he "would be the best parent and caregiver" for their child. Tragically, the child was stillborn. Father and his brother told her she could not visit her child, who was buried in Father's family cemetery.

Ms. Ross also testified in regard to an incident she reported to the police during her marriage to Father. She told the police that she and Father had fought and then had sexual intercourse. When asked if she had consented to sexual intercourse with Father on that occasion, Ms. Ross responded, "I don't know how to answer this question except for I was never in a position to say no." She explained that she felt that way because "[she] was afraid of him, and [she] knew if [she] had sex with him, he would typically not be angry anymore." Finally, counsel for Father asked Ms. Ross if Father was a good father to Noah based on her observations. She responded that "[h]e appeared to be a good buddy. Making meals, helping study, parental things, the caring portion was done by his mother."

Mother testified about her tumultuous three-year relationship with Father. Similar to Ms. Ross, Mother testified that Father interrogated her about her past and became upset when she admitted to kissing another man prior to meeting Father and to smoking cigarettes in the past. He then accused her of lying to him and shamed her for her behavior. On another occasion, Father objected to the clothing Mother planned to wear while on vacation with him, stating "You are not wearing a t-shirt on the plane. . . I'm not showing up in Europe with you looking like white trash." Mother stated that Father "made [her] feel like [she] would never be good enough for him and that he could never trust [her]." Near the end of their relationship, she was upset about how he had been treating her and confronted him about it. According to Mother, Father responded by slapping her across the face and "forc[ing] [her] to have sex with him."

Upon learning that Mother was pregnant, Father declared it was "a good thing" and insisted that she marry him. She informed him that she could not marry him in light of the way he had treated her. Father then threatened her by stating, "I have more money than you and I will take you to court and I will break you and I will take this baby from you." Mother stated that Father abused her and Ms. Ross because he acted "out of some sort of sick vengeance" to punish them for refusing to "go along with what he want[ed]."

Mother also testified about Father's controlling and abusive behavior towards Noah. For instance, Father had "interrogated" Noah and repeatedly videotaped visits with him using hidden video cameras. On the night before the incident where Mr. Bodine made the obscene gesture at Father, Noah appeared "very sad and upset." When Mother inquired about why he was upset, Noah responded, "My dad told me I'm not any good at basketball and I'm wasting my time and I don't have any talent."

Mother testified that, although Noah appeared smiling in photographs taken during a vacation with Father in 2013, Noah's smile was not genuine because he had to smile or Father would punish him. Specifically, she stated that Noah told her Father "put him in time out for not smiling in a picture." Additionally, during a supervised visit at McDonald's, Father "terrified" Noah by telling him "you're leaving with me tonight." Noah then developed a fear of kidnapping so severe that, on one occasion when a new supervisor appeared for a visit and was overly friendly with Father, Noah was afraid that the supervisor was going to help Father kidnap him.

Mother testified that she has attempted to promote a positive relationship between Father and Noah. She voluntarily expanded Father's parenting time in 2010. Again, in 2015, she voluntarily expanded Father's parenting time from two hours per week supervised visitation to two hours per week supervised visitation plus six hours supervised visitation on the second and fourth Saturday of every month. Mother explained that she arranged for the additional visits to be supervised by the Assurance Group rather than Parent Place because it would be more conducive to relationship building. Parent Place limited Father's visits to the Parent Place facility, but the Assurance Group allowed Father more freedom to interact with Noah by allowing him to take Noah to play tennis, swim, or visit the paternal family. A supervisor from the Assurance Group accompanied Father and Noah on these outings.

Mother acknowledged that she discussed with Noah the contents of some interrogatory questions she answered in August 2013. In those interrogatories, Mother disclosed some of the things Noah had told her about Father. She told Noah that Father now knew about some of the things Noah had mentioned to her. Mother explained that she had this discussion with Noah because he had an upcoming visit with Father and she knew Father "well enough to know that you don't go and tell people things about him or you will be punished for it." She did not want to send Noah for that visit unprepared for "the attack, the interview, the interrogation." According to Mother, "that's exactly what

happened. [Noah] was interrogated and . . . he came to school the next morning upset." The trial court found Mother credible.

Two witnesses, Sheila Sitzlar, the principal of Noah's school, and Patricia Rowan, Noah's third grade teacher, testified in regard to Noah being upset at school on the morning of August 14, 2013. When the children arrive at the school in the mornings, they must go to the gymnasium to read until school begins at 8:30 a.m. On the morning of August 14, 2013, Ms. Rowan was monitoring the third graders in the gymnasium. She testified that "Noah came into the gym and he was crying hysterically." He repeatedly stated, "My dad screamed at me and he was mean to me." Ms. Rowan escorted Noah from the gymnasium and into the hallway where Ms. Sitzlar was standing. According to Ms. Sitzlar, she took a crying Noah to her office at approximately 8:20 a.m. and Ms. Rowan returned to the gymnasium. Thereafter, Ms. Sitzlar called Mother to inform her that Noah was upset. Mother came to the school, and Ms. Sitzlar observed that Noah calmed down enough to go to class after speaking with Mother. Both Ms. Sitzlar and Ms. Rowan stated they did not have a relationship with Mother outside of school.

Father's proof focused on establishing that Mother's actions, not his, caused the problems in his relationship with Noah. Six employees and volunteers from Parent Place testified on behalf of Father. All six witnesses supervised at least one of Father's visits with Noah. Prior to scheduling the first visit at Parent Place, the visiting parent must set three goals to work towards during visits. At the end of each visit, the supervisors document whether or not they determined it to be a good visit. This determination is based, in part, on whether the visiting parent met all three goals during the visit. It is also based on the quality of the interaction between the visiting parent and the child.

Father set the following three goals to work towards during his visits with Noah: (1) "to promote learning and school and a creative mind," (2) to promote "a healthy lifestyle with diet and exercise," and (3) "for Noah to enjoy his visits and promote his well-being." The Parent Place witnesses testified that Father either met these goals or made progress towards them during most of his visits with Noah. He accomplished this by playing basketball, Pictionary, and videogames with Noah. Father also discussed school with Noah. According to the Parent Place witnesses, Noah often appeared to enjoy the visits with Father by laughing or clapping. Consequently, these witnesses rated most of Father's visits with Noah as "good" or "very good."

Father then presented testimony from two witnesses, Charles Elmore and David Pryor, who supervised some extended visits that occurred away from Parent Place. Mr. Elmore supervised a visit to Dollywood Splash Country and one to the Oak Ridge Children's Museum. He testified that, during these visits, Father and Noah were "interactive" but "there was some tension." Mr. Elmore did not observe any inappropriate behavior by Father. He acknowledged, however, that Noah expressed some anxiety on the way home from Dollywood due to an incident that occurred during the

visit where Father removed his sunglasses and twitched or wiggled his eyes at Noah. Initially, Mr. Elmore assumed this was a game but, on the way home, Noah began crying and saying Father "did the eye thing again" and "the twitching of the eyes scared him."

Mr. Pryor was the minister at Mother's church, and he supervised an extended visit where Father took Noah to the zoo. According to Mr. Pryor, Father and Noah joked with one another and Noah appeared to enjoy the visit. He stated that Father went "out of [his] way to give [Noah] a good time that day." Mr. Pryor believed that Father acted a "little bit inappropriate" when they first entered the zoo because he made a joke about the snakes getting out which "seemed to really unnerve Noah a bit with his fear of snakes." Besides that incident, Mr. Pryor did not observe any inappropriate behavior by Father.

James Frederick, a tennis instructor at the Knoxville Racquet Club where Father played tennis, testified next. Mr. Frederick testified that he has consistently seen Father at the racquet club three times per week since 2006. When he would see Father at the club, Father always appeared to have a positive and friendly demeanor. Mr. Frederick had never witnessed Father do anything inappropriate while at the racquet club. For approximately two years, Mr. Frederick was Noah's tennis coach. He stated that Noah appeared to enjoy playing tennis because he had a positive attitude and "laughed a lot." During this time period, Mr. Frederick had opportunities to observe Father playing tennis with Noah. Noah never displayed any anxiety or fear of Father. Rather, he appeared "happy to be on the court with [Father]." He described Father as "a very positive parent to [his] tennis-playing child" because Father never yelled at Noah and never really corrected him when he made mistakes. On cross-examination, Mr. Frederick acknowledged that he did not know Father outside of the time he observed him playing tennis at the racquet club. Consequently, he was unaware that Father had been accused of lying to a federal court and to the Board of Professional Responsibility.

The next witness was Father. He testified at length about things Mother did to alienate Noah from him, including not notifying him of Noah's birth "until significantly after" and not listing him on Noah's birth certificate. Father's efforts to establish an educational fund for Noah were delayed because Mother would not give him Noah's Social Security number. He admitted, however, that he did not mention to Mother that he wanted Noah's Social Security number so he could set up an educational fund. Father acknowledged that Mother expanded his parenting time in 2010 but attempted to minimize this fact by explaining that it was "the result of a bargaining process" rather than "some unilateral gifting" by Mother.

Father then testified that, after litigation resumed in 2012, Mother threatened to release a confidential document if Father insisted on taking her deposition a second time. The confidential document Mother threatened to release was a seventy-four-page memorandum and order from the federal district court for the eastern district of Tennessee. In this memorandum and order, the district court disciplined Father for

improper billing. Father explained that he filed the two separate lawsuits against Mother, in part, because she threatened to release this confidential document. Although Father acknowledged that Dr. Nancy Brown, a family psychologist who Father and Noah saw for family therapy, advised him to drop these other lawsuits, he initially disregarded this advice. Ultimately, Father did voluntarily nonsuit the two separate lawsuits against Mother, but he admitted he could still refile those lawsuits within one year.

Regarding income, Father stated that, at the time of trial, his income was negative $3,200 per month, totaling $38,400 in negative income per year. Despite reporting a negative income, Father still managed to pay two of his experts approximately $200,000 each. He testified that he had approximately $100,000 in savings that he was using to pay his living expenses and his experts. He had also used his home equity line of credit to pay his experts. The trial court found Father not to be credible.

Linn Guerrero, Father's fiancée, testified next on behalf of Father. She began spending time with Father and Noah in 2013 and observed that Noah was "a jokester" who liked to laugh. In 2013, Ms. Guerrero went on vacation to Key West, Florida with Father and Noah. She described Noah as upbeat, energetic, and "very affectionate" during the vacation, stating that "[t]here was a lot of hugging going on and a lot of I love you's." Ms. Guerrero rarely observed Father discipline Noah because Noah was well mannered. She did witness Father put Noah in time out while in Key West because he was "goofing off" when Father wanted to "take a nice picture." Ms. Guerrero admitted that she assisted Father in secretly video-recording visits with Noah but explained she did it because she wanted to show that "Noah was not having a bad time."

Ms. Guerrero testified that she was employed as an attorney at Father's law firm earning $65,000 per year. She lived with Father at the time of trial and contributed her salary towards their living expenses. Specifically, she stated that she paid for groceries and Father paid the utilities.

*Expert Testimony*

Dr. Vey Nordquist

The trial court heard testimony from eight expert witnesses. The first expert to testify was Dr. Vey Nordquist on behalf of Mother. He earned his Ph.D. in clinical psychology in 1970 and was a professor at the University of Tennessee for forty-four years. Dr. Nordquist has conducted over 600 court-ordered custody evaluations and has knowledge pertaining to parental alienation.

Mother began taking Noah to Dr. Nordquist in May 2013. He testified that he did not perform the role of a therapist in this case, but rather the role of monitor, meaning he observed Noah's behavior over a prolonged period of time. In his role as monitor, Dr.

Nordquist observed and interacted with Noah during eleven sessions he conducted over the course of a year. Although Dr. Nordquist primarily met with Noah during these sessions, he occasionally met with Mother as well.

Dr. Nordquist testified that, during his sessions with Noah, he determined that Noah was fearful and "very, very apprehensive" about Father learning how Noah truly felt about him. Delving into the source of Noah's fear of Father, Dr. Nordquist began by looking for a campaign of parental alienation by Mother. He opined, however, that she was not guilty of parental alienation. He explained that alienating parents "almost always . . . find ways to limit the contact" the other parent has with the child, but the opposite occurred in this case because Mother voluntarily expanded Father's parenting time and invited him to major events in Noah's life, such as graduation from preschool. Dr. Nordquist testified that he only witnessed one incident where Mother's conduct could possibly be consistent with parental alienation: the incident where she discussed with Noah her answers to some interrogatories. Although Dr. Nordquist believed such conduct was inappropriate, he did not believe that made Mother an alienator because she did not act in a malicious manner. Rather, she was trying to prepare Noah for questions from Father about the information she disclosed.

Dr. Nordquist concluded that, rather than being caused by a campaign of parental alienation by Mother, Noah's fear resulted from Father engaging in psychological control. He explained that psychological control occurs when a parent:

> attempts to make a child feel responsible for the bad things that are going on from the parent's view. Like if you don't do it this way, then I'm going to be really disappointed in you or get angry with you, and . . . we wouldn't be having this much trouble if you would just do what's expected of you.

He further explained psychological control as follows:

> THE WITNESS: Well, there's huge literature on psychological control, as opposed to behavioral control. Behavioral control is where you use time out, you remove privileges and so on, age-appropriate kinds of behavioral consequences for behavior.
>
> In psychological control, a parent can engage in -- well, there are at least six different strategies that are described in the literature.
>
> One is love withdrawal, for example. Another one -- and here you have a situation where a father allegedly, and I think that he's even acknowledged this, has said that he's going to put the mother in jail.

- 10 -

According to Dr. Nordquist there are more subtle types of psychological control, such as facial expressions and voice tone, that children Noah's age feel but are too young to articulate.  Dr. Nordquist stated that, when Noah says Father is mean, he is referring to Father using these more subtle types of psychological control.  In Dr. Nordquist's opinion, Noah was estranged from Father due to Father's own conduct—the use of psychological control.

Finally, Dr. Nordquist testified that Father filed a lawsuit against him, seeking $1.5 million for malpractice and emotional harm.  In his opinion, this constituted another form of psychological control.  The trial court found Dr. Nordquist credible.

Dr. Nancy Brown

Dr. Nancy Brown, a licensed clinical psychologist since 1986, testified on behalf of Father.  Over the course of this two-year trial, she testified three times.  The trial court appointed Dr. Brown to conduct family therapy for Noah and Father.  She conducted nine sessions of individual therapy with Noah, forty sessions of family therapy with Father and Noah, and one session of family therapy with Mother and Noah.

Dr. Brown recommended the trial court order Mother undergo individual therapy but stated it would be inappropriate for her to conduct the individual[4] therapy sessions with Mother.  Although Dr. Brown believed it would be inappropriate for her to conduct individual therapy sessions with Mother, she admitted to conducting seventy individual therapy sessions with Father without a court order to do so and without advising the court of such.

During the individual therapy sessions with Father, Dr. Brown focused on Father's "relationship with Noah and how to reestablish the trust."  She felt she "had made a connection" with Father, stating that he listened to her suggestions and remained respectful even if he disregarded them.  She admitted that she did not delve too deeply into past events, such as his videotaping and interrogation of Noah or Father's relationships with women.  Instead, Dr. Brown merely "focused on the present and the future" and advised Father to seek individual therapy from another psychologist for therapy related to past events.  As far as she was aware, Father did not follow this advice.  Dr. Brown also advised Father to dismiss his lawsuits against Mother because "lawsuits are very destructive to relationships."

Dr. Brown testified that, when Noah "lets his guard down," he interacts positively with Father, but he pulls back and cuts off emotional attachment after realizing he is having a good time.  After fourteen months of therapy, Noah still did not want to be alone with Father.  Despite Noah's continued resistance, Dr. Brown recommended that the

---

[4] Dr. Brown also referred to individual therapy sessions as "collateral therapy."

court allow Father unsupervised visits, opining that any resulting issues could be resolved in therapy.

With respect to parental alienation, Dr. Brown testified that it "really is not a diagnosis." Nevertheless, she concluded that parental alienation was occurring in this case. Specifically, she concluded that Mother was alienating Noah from Father. When the court asked her to discuss the facts supporting her conclusion, Dr. Brown was unable to do so. She then admitted that her only experience with parental alienation was "with an article" about parental alienation.

Dr. Brown suggested that Mother should participate in family therapy. Mother resisted participating in family therapy with Dr. Brown, however, after Dr. Brown disclosed to Father the location of Noah's birthday party, which Mother believed she had shared with Dr. Brown in confidence. Dr. Brown admitted that Mother raised complaints about the individual therapy sessions with Father, fearing that Dr. Brown would disclose conversations between Mother and Dr. Brown to Father, which he would then use to create "more court problems."

The trial court removed Dr. Brown from her role as court-appointed family therapist and discredited her testimony, finding that "[h]er decision to conduct collateral therapy with [Father] without court approval certainly creates the appearance of bias and impropriety."

Sarah Littlefield

The parties stipulated to the admission of the deposition of Sarah Littlefield, a marital and family therapist who conducted six individual therapy sessions with Noah. Noah began seeing her in the summer of 2014 while still seeing Dr. Brown for family therapy.

Ms. Littlefield testified that she had no experience with parental alienation. In her opinion, Noah suffers from anxiety caused by his concerns about seeing Father and Father yelling at him. Consequently, during her sessions with Noah, she focused on teaching him techniques to cope with his anxiety. The trial court found her credible.

Dr. Tom Hanaway

Dr. Tom Hanaway testified on behalf of Mother. He is a licensed clinical psychologist and family therapist who earned his Ph.D. in 1975. After the court removed Dr. Brown from the case, Mother engaged Dr. Hanaway to conduct family therapy with Father and Noah. He explained that his goals were to move Father and Noah towards unsupervised visits and to resolve past problems that caused Noah to not want to visit with Father. In order to achieve these goals, Dr. Hanaway recommended the parties

collaborate to establish trust, strengthen the relationship between Father and son by taking small steps, and improve parenting skills. Dr. Hanaway believed that, during the six months he was involved with the case, the parties were making progress because the sessions with Noah and Father were positive and several "hours long" unsupervised visits had occurred.

Although the parties were making progress, Dr. Hanaway testified there remained some issues to resolve. For instance, Noah panicked and started hyperventilating each time Dr. Hanaway discussed him spending unsupervised parenting time with Father. Moreover, Noah expressed to Dr. Hanaway that he felt uncomfortable at the paternal grandmother's home due to events that had occurred there, such as Father interrogating him about Dr. Nordquist. In May 2016, Noah mentioned to Dr. Hanaway that he experienced fear during a recent visit with Father because a new supervisor was present at this visit and appeared to be overly friendly with Father. Noah believed that the new supervisor was going to help Father kidnap him. Dr. Hanaway discussed this visit with Noah and Father during a family therapy session. He testified that, during this session, he explained to Noah that his fear was irrational and suggested that he should discuss similar fears with Mother or Father when he has them in the future. When the session concluded, Dr. Hanaway believed the issue was resolved. During a supervised visit two days later, however, Father confronted Noah and "browbeat" him about the kidnapping accusation. Father sat Noah down and, with a "stern and direct" voice, stressed the importance of being honest and not falsely accusing people. Dr. Hanaway opined that this incident caused Noah a setback in his relationship with Father and explained that what Noah was experiencing with Father is similar to post-traumatic stress disorder ("PTSD").

Dr. Hanaway testified that he found no evidence of parental alienation by Mother. Instead, he observed that Mother encouraged Noah to spend time with Father and to have a relationship with him. Dr. Hanaway admitted that he believed Noah was playing his parents "off of each other," but he believed Father failed to take enough responsibility for what he had done to contribute to the situation.

Dr. Hanaway testified that he felt bullied by Father. Specifically, Father threatened to depose Dr. Hanaway and subpoena him to court when he refused to do something Father wanted him to do. Father's behavior ultimately caused Dr. Hanaway, who was seventy-six years old at the time of trial, to have anxiety, stomach aches, and difficulty sleeping at night. Based on his experience with Father, Dr. Hanaway opined that Noah had probably had experiences with Father that frightened him. Dr. Hanaway recommended that the parties find a new family therapist. The trial court found Dr. Hanaway credible.

- 13 -

Dr. James Flens

Dr. James Flens, a board-certified clinical psychologist in Florida, testified on behalf of Father. He wrote an article on parental alienation that focused on one parent acting as a gatekeeper who "either opens or closes or keeps the door closed" to the other parent regarding access to or information about the child.

Dr. Flens did not interview or evaluate anyone in this case, not even Noah. Rather, he reviewed reports from Dr. Nordquist, Noah's school, and the personnel supervising visits. He also reviewed various videos, depositions, and other documents associated with the case. He attended every hearing in this matter.

Despite there being no evidence that Mother made negative comments about Father and hearing proof that Mother voluntarily expanded Father's parenting time between 2006 and 2013, Dr. Flens believed that Mother was alienating the child. He based his opinion, in large part, on his review of psychological test results for both parents from evaluations conducted earlier in the case by other psychologists.[5] He explained that there is some correlation between psychological test results and parental alienation. For instance, alienators often present themselves during psychological testing as "having high morals and virtues" and being "holier than thou." Dr. Flens testified that the results from Mother's psychological testing were consistent with those of an alienator. He explained that "[M]other was trying to make herself look good, much more . . . significantly than is common in these cases, where [F]ather did not." He acknowledged that neither parent fostered a positive relationship between the child and the other parent. He repeatedly described Father as "intense."

Dr. Flens testified that the supervised visits needed to end but recommended a gradual reunification with Father. He acknowledged that Noah experienced anxiety when around Father but stated that, if Noah was opposed to unsupervised parenting time with Father, he needed to "get over it." Although Dr. Flens never interviewed Noah, he believed Noah could "get over it" because he is "a pretty tough kid."

On cross-examination, Dr. Flens admitted that Father paid him $4,000 per day, for a total of more than $200,000. The trial court rejected Dr. Flens's expert opinion.

Dr. Sol Rappaport

Dr. Sol Rappaport, a licensed clinical psychologist, also testified on behalf of Father. He primarily performs forensic evaluations, which he explained are "custody evaluations and psychological evaluations of children and adults." He had testified as an expert witness over fifty times.

_____

[5] The psychologists who performed these tests did not testify at trial.

- 14 -

Dr. Rappaport reviewed reports of the supervised visits, correspondence between the attorneys in the case, and some court documents. He spoke to Noah's pediatrician and personnel from his school. Additionally, over the course of two days, Dr. Rappaport spent approximately five hours interviewing Noah. Dr. Rappaport admitted he did not interview Mother, but he did spend several hours interviewing Father. He opined that Noah is an alienated child in regard to his relationship with Father. He believed that Mother contributed to Noah's alienation because she had some anxiety about him visiting with Father and "Noah picks up on it." Moreover, he found Noah to be "overly dependent on his mother for a child his age," which caused separation anxiety issues.

Dr. Rappaport opined that the longer supervised visits continued, the more risk there was of harm to Noah because supervised visits send "implicit messaging that there's something wrong." He suggested a multi-layered therapy program for Father and Noah. Specifically, there should be a therapist who works with Father and Noah together, a therapist who works with each of the parents alone, and a therapist who oversees all of the treatment providers to ensure that they are all working together. Dr. Rappaport testified that he could not make a permanent custody recommendation.

The trial court found Dr. Rappaport's testimony not credible because he based most of his opinions on conversations he had with Father, whom the court found not credible.

### Dr. Edward Workman

Dr. Edward Workman testified by deposition on behalf of Father. He is a clinical associate professor of neuropsychiatry at the University of Tennessee Medical Center. He primarily works with patients who have brain injuries, mood disorders, and PTSD.

Dr. Workman reviewed records from other experts associated with the case, records from the supervised visits, trial testimony, and depositions. He discussed numerous topics including parental alienation. Without psychologically evaluating either parent, Dr. Workman opined that Noah had been alienated from Father. He based his opinion, in large part, on statements Noah made when he was interviewed by Dr. Rappaport in 2016. For instance, Dr. Workman relied on statements Noah made indicating that he detected Mother experienced anxiety when he visited Father.

During cross-examination, Dr. Workman admitted that he could not objectively assess Mother because she threatened him. He further admitted to acting as an expert for Father approximately twenty-five times. The trial court found Dr. Workman not credible.

Dr. Salmaan Toor

Finally, Dr. Salmaan Toor, a licensed clinical psychologist, testified on behalf of Mother. Dr. Toor was conducting family therapy with Noah and Father at the time of trial. He testified that his treatment plan was to create an environment where Noah felt comfortable and then gradually work towards reunification with Father. He primarily focused on helping Noah manage his anxiety. Noah expressed to Dr. Toor that Father had done things in the past that caused anxiety for him, such as interrogating him, recording him on camera, yelling at him, and making an angry face at him. Noah further expressed to Dr. Toor that he preferred not to be alone with Father. Because Dr. Toor had no experience with parental alienation, he made no assessment regarding whether it had occurred in this case. The trial court found Dr. Toor credible.

*Trial Court's Ruling*

On April 11, 2017, the trial court entered an order finding that Father is Noah's father, but Noah's surname should not be changed to "Justice." The court concluded that Mother did not alienate Noah from Father and designated her as the primary residential parent. The court then found Father had engaged in conduct that necessitated limiting his parenting time. Specifically, the court found that Father "has exhibited a pattern of manipulation, over-controlling and bullying in his life" that causes "serious concerns about his ability to parent since over the three years this Court has been assigned to this matter he continues this previously-established pattern." As a result, the court entered a residential parenting schedule that gives Father zero days of parenting time with Noah.[6]

Under this parenting schedule, Father has a mixture of supervised and unsupervised parenting time that is to occur in four stages. Stage one (May 1, 2017 to October 31, 2017) permits Father supervised parenting time the first and third Saturday of each month from 9:00 a.m. to 7:00 p.m. and every second and fourth Tuesday from 4:00 p.m. to 7:30 p.m. During stage two (November 1, 2017 to April 30, 2018), Father may exercise supervised parenting time every first and third Saturday from 9:00 a.m. to 7:00 p.m. and unsupervised parenting time every second and fourth Tuesday from 4:00 p.m. to 7:30 p.m. Stage three (May 1, 2018 to October 31, 2018) provides Father unsupervised parenting time the first Saturday of every month from 9:00 a.m. to 7:00 p.m. and supervised parenting time the third Saturday of each month from 9:00 a.m. to 7:00 p.m. This stage also permits Father unsupervised parenting time every second and fourth Tuesday from 4:00 p.m. to 7:30 p.m. Finally, stage four (November 1, 2018 until Noah reaches majority) provides Father unsupervised parenting time the first and third

---

[6] Despite providing Father with parenting time, the parenting plan states that Father has zero days of parenting time because Noah does not spend more than twelve consecutive hours in Father's custody. *See* TENN. COMP. R. & REGS. 1240-02-04-.02(10) ("A 'day' of parenting time occurs when the child spends more than twelve (12) consecutive hours in a twenty-four (24) hour period under the care control or direct supervision of one parent or caretaker.").

Saturday of each month from 9:00 a.m. to 7:00 p.m. and every second and fourth Tuesday from 4:00 p.m. to 7:30 p.m.

The trial court then ordered Father to pay child support to Mother in the amount of $1,619 per month and awarded Mother her attorney fees in the amount of $376,638.90. Father appealed.

## II. Standard of Review

We review a trial court's findings of fact de novo upon the record, with a presumption of correctness, unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review a trial court's conclusions of law de novo, according them no presumption of correctness. *Armbrister*, 414 S.W.3d at 692; *In re Piper H.*, No. W2015-01943-COA-R3-JV, 2016 WL 5819211, at *4 (Tenn. Ct. App. Oct. 5, 2016). A trial court's decision regarding a parenting arrangement is reviewed for an abuse of discretion. *In re Noah J.*, No. W2014-01778-COA-R3-JV, 2015 WL 1332665, at *3 (Tenn. Ct. App. Mar. 23, 2015). As the Tennessee Supreme Court has explained:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*,190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88.

- 17 -

*Armbrister*, 414 S.W.3d at 693. The abuse of discretion standard does not allow appellate courts to substitute their judgment for that of the trial court, but it "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives.'" *Gonsewski*, 350 S.W.3d at 105 (quoting *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

III. ANALYSIS

A. Trial Judge's Recusal

Father sought recusal of Judge Ash several times during the two years of trial;[7] Judge Ash denied each request. On appeal, Father argues that Judge Ash should have granted a recusal because his rulings contain repeated misapplications of "fundamental, rudimentary legal principles'" that favored Mother "'substantively and procedurally." *See Krohn v. Krohn*, No. M2015-01280-COA-T10B-CV, 2015 WL 5772549, at *7 (Tenn. Ct. App. Sept. 22, 2015).

Judges should recuse themselves if they "have any doubt about their ability to preside impartially in a case or when 'a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" *Krohn*, 2015 WL 5772549, at *4 (quoting *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564 (Tenn. 2001)). Appellate courts review a trial court's disqualification or recusal determination under a de novo standard of review. TENN. SUP. CT. R. 10B, § 2.01.

*Hoalcraft v. Smithson*, No. M2000-01347-COA-R10-CV, 2001 WL 775602, at *16-17 (Tenn. Ct. App. July 10, 2001), is one of the few cases in Tennessee to use "repeated misapplication of fundamental, rudimentary legal principles" as a ground for recusal. In *Hoalcraft*, the trial court misapplied the burden of proof required in a custody case, conducted a hearing on a pleading despite all of the issues it raised being ruled upon previously by the Court of Appeals, disqualified one party's attorney without reasonable cause, held a hearing in the absence of one party's attorney after both sides had agreed to a continuance, and made suggestions to one party's attorney concerning issues that should be raised on appeal. *Id.* at *16.

---

[7] We note that, in Father's last motion to recuse, he made the following comment about the trial judge: "This is such a loss of judgment a reasonable outside observer would find the proceedings corrupt." Later in his motion, he shockingly referred to Judge Ash as "Yosemite Sam": "When a Court's persistent demeanor is less in the nature of Learned Hand or Oliver Wendell Homes and more Yosemite Sam, particularly in a matter involving child welfare, the Court cannot continue to preside."

In this case, Father has not asserted anything similar to what occurred in *Hoalcraft*. Rather, he asserts Judge Ash erred in his questioning of witnesses and in his statements on the record about Father.

The first error Father asserts is that Judge Ash "highjacked" his proof by questioning his witnesses. It is within the sound discretion and duty of a judge to clear up any confusion in the testimony or facts of a case. *See Ching-Ming Chen v. Advantage Co., Inc.*, 713 S.W.2d 79, 82 (Tenn. Ct. App. 1986). The record reflects that Judge Ash did question some of Father's witnesses. For instance, he questioned Dr. Brown regarding the nature of her individual therapy sessions with Father and the recommendations she made to him during these sessions. Later in the trial, Judge Ash questioned Father about his income in an effort to discern how he could claim a negative monthly income of $3,200 but still pay his bills. This was also the purpose behind Judge Ash questioning Ms. Guerrero about the salary she earned from Father's law firm.

Father also asserts that Judge Ash asked Dr. Flens questions in an attempt to intimidate him and sway his opinion that Mother alienated Noah from Father. The record does not support this assertion. Rather, the record shows that, while Dr. Flens explained some of the intervention programs available for treating parental alienation, Judge Ash asked him if he recommended the court implement those programs at that time; Dr. Flens did not recommend the court do that. We find no abuse of discretion by the trial court in questioning Father's witnesses.

The second error asserted by Father concerns statements Judge Ash made about Father. Father argues that Judge Ash demonstrated bias requiring recusal by repeatedly accusing Father of dishonesty. During trial, the parties disputed whether Noah should be called as a witness. When Judge Ash stated he could call Noah as a witness to hear his preference, Father told Judge Ash he did not have the authority to do that because a judge may only "call witnesses based on extraordinary circumstances." According to Father, Judge Ash then "accused him of dishonesty and made a speech on how ""disappointing"" [Father] was." Moreover, Father asserts that Judge Ash accused him of dishonesty in the drafting of a declaration for Father's brother, which stated the brother was a practicing physician.

A thorough review of Father's brief shows that his argument concerning this second asserted error fails to comply with the requirements of Rule 27 of the Tennessee Rules of Appellate Procedure or Rule 6 of the Rules of the Court of Appeals. Tennessee Rule of Appellate Procedure 27(a)(7)(A) requires that an appellant's argument set forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and *appropriate references to the record* (which may be quoted verbatim) relied on." (Emphasis added). Likewise, Rule 6(a)(1) requires that a written argument for each issue appealed contain:

> A statement by the appellant of the alleged erroneous action of the trial court which raises the issue and a statement by the appellee of any action of the trial court which is relied upon to correct the alleged error, *with citation to the record where the erroneous or corrective action is recorded*.

(Emphasis added).

Here, Father's argument section regarding the second error requiring recusal provides citations to the record, but those citations are incorrect. Examination of the provided citations shows no mention of dishonesty, Noah being called as a witness, or the brother's declaration. Generally, when a party fails to refer properly to the record or to cite to relevant authority, we consider that issue waived. *Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000). We have no duty "to verify unsupported allegations in a party's brief or to research and construct the party's argument." *Chiozza v. Chiozza*, 315 S.W.3d 482, 489 (Tenn. Ct. App. 2009). It is not the function of this court to search through fifty volumes of technical record and seventy-eight volumes of trial transcript to locate the portions of the record that support Father's allegations. Thus, his argument regarding the second error requiring recusal is waived.

In light of the foregoing, we conclude that Father failed to establish grounds to require the recusal of Judge Ash.

B. Rule 52.01

Father argues that the trial court's final order violates Tennessee Rule of Civil Procedure 52.01 because the court failed to make specific findings of fact and conclusions of law. Specifically, he argues that "[t]here is no way this Court can trace the trial court's chain of reasoning sufficiently" to uphold its ruling. Rule 52.01 provides, in pertinent part, that "[i]n all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment."

Specific findings of fact and conclusions of law serve three purposes. *Lovlace v. Copley*, 418 S.W.3d 1, 34 (Tenn. 2013). First, they facilitate appellate review by providing the reviewing court "a clear understanding of the basis of a trial court's decision." *Id.* Second, these findings clarify which issues the trial court is deciding so that the doctrines of estoppel and res judicata may be applied in future cases. *Id.* at 35. Third, this requirement serves "'to evoke care on the part of the trial judge in ascertaining and applying the facts,'" perhaps thereby reducing the likelihood a case will appealed. *Id.* (quoting 9C Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 2571, at 221-22 (3d ed. 2005)).

- 20 -

In regard to appellate review of whether a trial court complied with Rule 52.01, our Supreme Court has stated:

> There is no bright-line test by which to assess the sufficiency of factual findings, but "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue."

*Id.* (quoting 9C FEDERAL PRACTICE AND PROCEDURE § 2579, at 328). As a result, "[s]imply stating the trial court's decision, without more, does not fulfill [the Rule 52.01] mandate." *Barnes v. Barnes*, No. M2011-01824-COA-R3-CV, 2012 WL 5266382, at *8 (Tenn. Ct. App. Oct. 24, 2012).

Here, the trial court made specific findings of fact regarding each expert witness, parental alienation, and whether Noah's surname should be changed. The court also made specific findings of fact for each factor Tenn. Code Ann. § 36-6-106(a) requires a court to consider when fashioning a residential parenting schedule and each of the factors listed in Tenn. Code Ann. § 36-6-406 that would necessitate limitation of Father's residential time with the child. Based on these findings, the court concluded that Mother should be the primary residential parent and Father's parenting time should be limited. The trial court did more than simply state its decision. Rather, it provided sufficient findings to reveal the steps it followed to reach its ultimate decision. We conclude that the trial court's order satisfies the requirements of Rule 52.01.

### C. Witness Credibility

Father argues that the trial court abused its discretion in finding Mother credible but finding Father and his expert witnesses not credible. Appellate courts "afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). We will not reevaluate a trial court's assessment of a witness's credibility unless there is clear and convincing evidence to the contrary. *Id.* Evidence is clear and convincing if it "eliminate[s] any 'serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Id.* at 692-93 (quoting *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012)).

Appellate courts do not apply the same deferential standard when the trial court's findings of fact are based on documentary evidence such as depositions, transcripts, and video recordings. *Id.* at 693. Instead, "[w]hen factual findings are based on documentary evidence, an appellate court may draw its own conclusions with regard to the weight and credibility to be afforded that documentary evidence." *Id.*

In the present case, Mother testified in court during the trial. Father then entered both of her depositions into evidence. On appeal, Father relies on these depositions to argue that Mother was not a credible witness. Because the depositions constitute documentary evidence, we may draw our own conclusions about the weight and credibility to be given to this evidence. A thorough review of Mother's depositions shows that, although there were some inconsistencies, the majority of her deposition testimony corresponded to her in-court testimony. Moreover, most of the inconsistencies pertained to things that occurred before the child was born. We afford little weight to this evidence and find no abuse of discretion in the trial court's determination that Mother was a credible witness.

With respect to Father's expert witnesses, the trial court found that Drs. Flens, Rappaport, and Workman were not credible. Drs. Flens and Rappaport testified in court. Father does not present clear and convincing evidence contradicting the trial court's finding that these two witnesses were not credible. We, therefore, decline to reverse the trial court's credibility assessment of these two witnesses.

Dr. Workman, on the other hand, testified by deposition. A thorough review of Dr. Workman's deposition reveals that he opined Noah had been alienated from Father. He admitted, however, that he formed this opinion without psychologically evaluating either parent and without interviewing Noah. Rather, he based his opinion on statements Noah made to Dr. Rappaport. Dr. Workman admitted he could not give an objective assessment of Mother because she threatened him. In light of this testimony, we conclude, as the trial court did, that Dr. Workman is not credible.

D. Rule 408

Father next argues that the trial court erred in excluding a proposed agreed order and parenting plan. The proposed order and parenting plan were the result of lengthy settlement negotiations the parties entered into on August 10, 2016. Pursuant to the proposed order, Father would pay Mother $200,000 for her attorney fees and $200,000 for child support arrearages. Ultimately, the settlement negotiations failed and the parties did not sign the proposed order and parenting plan. At trial, Father took the position that Mother did not believe her contention that supervised visitation was necessary. Rather, she intended to allow Father unsupervised parenting time with Noah in exchange for $400,000. Father attempted to support this argument by entering the proposed order into evidence. The trial court found that the proposed order was evidence of settlement negotiations and excluded it under Tenn. R. Evid. 408.

Tennessee Rule of Evidence 408 provides that evidence of offering or accepting consideration in the compromise of a claim is "not admissible to prove liability for or invalidity of a civil claim or its amount or a criminal charge or its punishment." Evidence of conduct or statements made during settlement negotiations is also not

admissible. TENN. R. EVID. 408. Rule 408 does not, however, "require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."

In the present case, Father asserts that the proposed order should not have been excluded under Rule 408 because it was offered for a purpose other than proving liability on a civil claim or the monetary amount. Instead, he asserts it was offered to prove that Mother attempted to extort money from him during the settlement negotiations by holding Noah hostage and offering Father unsupervised visitation in exchange for $400,000. Relying on *Uforma/Shelby Business Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293 (6th Cir. 1997), Father argues that Rule 408 is inapplicable to wrongful acts committed during settlement negotiations.

*Uforma* involved a corporation charged with violating the National Labor Relations Act in various ways, including threatening the union. *Uforma*, 111 F.3d at 1287. At trial, the union supported this claim by introducing evidence that, during compromise negotiations, the corporation threatened to eliminate the third shift if the union pursued its grievance. *Id.* at 1287-88. The corporation argued this evidence should have been excluded as settlement negotiations. *Id.* at 1293. The Sixth Circuit Court of Appeals interpreted Federal Rule of Evidence 408, which is essentially identical to the Tennessee rule, and concluded that the rule "does not exclude evidence of alleged threats." *Id.* at 1294. As the court explained, "'Rule 408 is . . . inapplicable when the claim is based upon some wrong that was committed in the course of the settlement discussions.'" *Id.* at 1293 (quoting 23 Charles Alan Wright & Kenneth W. Graham, Jr., FEDERAL PRACTICE AND PROCEDURE: *Evidence* § 5314 (1st ed. 1980)).

The present case is distinguishable from *Uforma*. Unlike in *Uforma*, none of the evidence Father sought to introduce tends to show that Mother engaged in extortion or holding Noah hostage. The proposed order allowed Father unsupervised parenting time but makes no reference to him paying Mother for that unsupervised parenting time. Rather, the proposed order provided he would pay Mother $200,000 for her attorney fees and $200,000 for child support arrearages. If hostage negotiations could be established merely by one parent offering parenting time to the other parent in connection with attorney fees and child support, every case involving parenting time with a child and a child support determination coupled with an award of attorney fees would constitute a hostage negotiation. Thus, we conclude that Father's offered proof fails to show that Mother committed a wrongful act that would render Rule 408 inapplicable.

Father also asserts that the proposed order should not have been excluded under Rule 408 because it shows Mother maintained her claim in bad faith. Specifically, he argues that the fact Mother offered him unsupervised parenting time proves she did not believe her legal position that supervised parenting time was necessary. In support of this

argument, Father relies on *Mendenhall v. National Transportation Safety Board*, 92 F.3d 871 (9th Cir. 1996), a case involving a commercial pilot whose license was wrongly revoked by the Federal Aviation Administration ("FAA"). *Mendenhall*, 92 F.3d at 873-74. The pilot's attorney informed the FAA that the pilot had complied with FAA recommendations and requested that the matter be dismissed, but the FAA declined to do so. *Id.* at 874. The attorney for the FAA then called the pilot's attorney and acknowledged that the pilot was qualified to hold a commercial pilot certificate. *Id.* at 873. The attorney for the FAA informed the pilot's attorney that the FAA would dismiss the complaint if the pilot would waive reimbursement for attorney fees under the Equal Access to Justice Act ("EAJA"). *Id.* at 873-74. After the FAA dismissed the order revoking the pilot's certificate, the pilot filed an application for reimbursement of her attorney fees under the EAJA. *Id.* at 874. At the hearing on the pilot's application, evidence of the conversation between the attorneys was excluded as evidence of settlement negotiations. *Id.* at 876. As a result, the application was denied. *Id.* at 874. On appeal, the *Mendenhall* court reversed the administrative agency's decision, finding that the attorneys' conversation should not have been excluded. *Id.* at 876-77.

Father's reliance on *Mendenhall* is misplaced. The *Mendenhall* court recognized that "the agency's continuation of an action it knew to be baseless . . . is a prime example of 'bad faith.'" *Id.* at 877. The court concluded that the administrative agency erred in denying the pilot's application for fees because evidence relating to the conversation between the FAA attorney and the pilot's attorney was improperly excluded under Fed. R. Evid. 408. *Id.* at 876. Contrary to Father's argument, however, the court did not conclude that Rule 408 was inapplicable due to "bad faith." Rather, the court explained that the conversations did not constitute settlement negotiations shielded by Rule 408 because "there was nothing to settle at the time these conversations occurred." *Id.* Unlike *Mendenhall*, the proposed order in this case occurred at a time when numerous issues remained to be settled, and the parties were, in fact, engaged in settlement negotiations. Thus, we find no error in the trial court's decision to exclude the proposed order under Rule 408.

### E. Other Evidentiary Issues

#### 1. Hearsay Evidence

Father argues that the trial court erroneously excluded thirty-nine pieces of evidence as hearsay. This section of his appellate brief, however, fails to comply with Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure because he provides conclusory statements with no argument or legal authority to support his claims. It is not the role of this or any court "to research or construct a litigant's case or arguments for him." *Sneed v. Bd. of Prof'l Responsibility of Sup. Ct. of Tenn.*, 301 S.W.3d 603, 615 (Tenn. 2010). As previously mentioned, a party waives an argument if he or she fails to

comply with the requirements of Tenn. R. App. P. 27(a)(7). *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012); *Bean*, 40 S.W.3d at 55. We deem this argument waived.

### 2. Dr. Nordquist

Father then argues that the trial court erred in not excluding Dr. Nordquist altogether because his data was untrustworthy. Our Supreme Court has previously held that "a trial court must determine whether the evidence will substantially assist the trier of fact to determine a fact in issue and whether the facts and data underlying the evidence indicate a lack of trustworthiness." *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997). To assist courts in determining the reliability of scientific evidence, the *McDaniel* court stated the following may be considered: (1) whether the evidence has been tested and how it was tested, (2) "whether the evidence has been subjected to peer review or publication," (3) whether there is a known potential rate of error, (4) whether the scientific community generally accepts the evidence, and (5) whether the expert conducted the research at issue independent of the litigation. *Id.*

Oddly, Father does not argue that Dr. Nordquist's data is untrustworthy due to any of these five factors. Rather, he argues the data is untrustworthy because Dr. Nordquist belongs to a professional organization that has as members a cat and a man in prison. There is no dispute that this professional organization does not have a rigorous acceptance process. There is no evidence, however, that Dr. Nordquist relied on information from this professional organization in making his conclusions. In fact, there is no evidence in the record connecting this professional organization to the underlying data Dr. Nordquist relied upon in making his conclusions. Dr. Nordquist's affiliation with this professional organization, by itself, does not indicate that the underlying data is untrustworthy. This argument is without merit.

Father also argues that Dr. Nordquist should have been excluded from testifying because he did not update his expert disclosure prior to trial. Tennessee Rule of Civil Procedure 26.05(1) provides, in pertinent part, that "[a] party is under a duty seasonably to supplement the party's response with respect to any question directly addressed to . . . the identity of each person expected to be called as an expert witness at trial, the subject matter on which the person is expected to testify, and the substance of that testimony." Pursuant to Tenn. R. Civ. P. 37.03(1), a party is not permitted to use as evidence at trial any witness or information not disclosed in accordance with Rule 26.05. We review a trial court's decision to impose sanctions under Tenn. R. Civ. P. 37 for an abuse of discretion. *Amanns v. Grissom*, 333 S.W.3d 90, 98 (Tenn. Ct. App. 2010). If reasonable minds could disagree as to the soundness of a discretionary decision, we ordinarily permit the decision to stand. *Id.*

Here, a thorough review of the record reveals that Dr. Nordquist submitted an expert disclosure prior to his November 19, 2014 deposition. Following his deposition,

Dr. Nordquist reviewed additional documents but failed to update his expert disclosure prior to testifying at trial in May 2015. The court allowed Dr. Nordquist to testify, but he was not permitted to testify about anything he reviewed post-disclosure, except for rebuttal testimony. Reasonable minds could differ as to the soundness of the trial court's decision to impose this sanction. We may not substitute our judgment for that of the trial court. *Id.* (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). We find no abuse of discretion in the trial court's decision to impose this sanction.

F. Sanctions with Regard to Dr. Workman

At trial, Father introduced into evidence the deposition of Dr. Workman. Mother objected and argued that Dr. Workman's deposition should be stricken from the record because he testified about information he obtained from videotapes that were never disclosed to Mother despite discovery requests that Father produce such evidence. After hearing the parties' arguments, the trial court admitted Dr. Workman's deposition into evidence but ordered Father to pay the cost of Dr. Workman's deposition, which totaled $5,000. Father argues on appeal that the trial court erred in imposing this sanction.

As discussed above, Tenn. R. Civ. P. 37.03 permits a trial court to exclude evidence when a party fails to supplement discovery requests in accordance with Rule 26.05. This is not the only sanction available to the court. Rule 37.03(1) also permits trial courts "to requir[e] payment of reasonable expenses (including attorney fees) caused by the failure."

A careful and thorough review of the record shows that counsel for Mother cross-examined Dr. Workman during his deposition on March 10, 2017. Although Dr. Workman was noticed by Father for an audiovisual deposition, Dr. Workman refused to allow the deposition to be videotaped. In an attempt to discredit Dr. Hanaway, Dr. Workman testified that Dr. Hanaway had referred to Noah as "a little sh[**]" and described Mother as "an irrational b***h." He admitted that he heard Dr. Hanaway make these statements on tapes secretly recorded by Father and Father's counsel. Earlier in the litigation process, Mother issued discovery requesting that Father produce "all recorded conversations, whether they be recorded by audio or video or any other means whatsoever, or transcripts of conversations or statements by any person or entity regarding or related to any aspects of this lawsuit." Father possessed these tapes for at least six months, but he failed to produce them for review by Mother's counsel.

In light of the foregoing, we conclude that the trial court did not abuse its discretion in imposing this sanction.

G.  Missing Witness Rule

Father argues that the trial court erred in failing to apply the missing witness rule. We disagree.  Pursuant to the missing witness rule, a party's failure to call a witness "gives rise to a permissible inference that the missing witness' testimony would have been unfavorable to the party who failed to call the witness."  *Gentry v. Gentry*, No. E2000-02714-COA-R3-CV, 2001 WL 839714, at *4 (Tenn. Ct. App. July 25, 2001) (footnote omitted).  Here, Father argues that Mother's failure to call her family members, (Mr. Bodine, Mrs. Hazelwood, and Mr. Hazelwood) creates an inference that their testimony would have been adverse to her position.

Typically, the missing witness rule applies "in the context of a jury trial, where the judge instructs the jury as to how they may interpret the evidence or the absence of evidence."  *Rittenberry v. Pennell*, No. M2010-01244-COA-R3-CV, 2011 WL 1661770, at *10 (Tenn. Ct. App. Apr. 29, 2011).  This rule does not create a presumption; it merely allows a "'permissive inference.'"  *In re D.P.M.*, No. M2007-02741-COA-R3-PT, 2008 WL 4693725, at *12 (Tenn. Ct. App. Oct. 23, 2008) (quoting *State v. Francis*, 669 S.W.2d 85, 88 (Tenn. 1984)).  The missing witness rule may be applied in the following circumstances:

> (1) the party that failed to produce the witness . . . had it within their power to produce such witness . . . ; (2) the missing witness . . . was under the party's control; (3) the witness . . . was not equally available to the other party; (4) the witness's testimony . . . would not simply be cumulative; (5) a reasonable person in the party's position would have produced the witness . . . if such witness . . . would have been helpful; and (6) the party has not given a reasonable excuse for failing to present the witness . . . .

*In re Estate of Hamilton*, No. M2009-01882-COA-R3-CV, 2011 WL 532296, at *5 (Tenn. Ct. App. Feb. 14, 2011).

The missing witness rule is inapplicable to this case.  Father has failed to show how the missing witnesses were under Mother's control and unavailable to him to subpoena to testify at trial.  Moreover, the rule "applies to jury trials where the trial judge instructs the jury how to interpret the evidence or lack thereof."  *Id.* at *6.  Father fails to explain how this rule applies to a bench trial like the one here.  Thus, we conclude that the missing witness rule does not apply in this case.

H.  Due Process

Father next argues that the trial court deprived him of procedural due process.  The Fourteenth Amendment to the United States Constitution and Article 1, Section 8 of the Tennessee Constitution provide that the government may not deprive an individual of

life, liberty, or property without due process of law. *Heyne v. Metro. Nashville Bd. of Pub. Educ.*, 380 S.W.3d 715, 731 (Tenn. 2012). A fundamental requirement of due process is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 732 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). When a court's decision hinges on questions of fact, due process requires that litigants have the opportunity to cross-examine adverse witnesses. *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). Here, Father argues that the trial court deprived him of due process by conducting the trial over the period of two years, restricting his cross-examination of Ms. Ross, prohibiting him from conducting Mother's second deposition, refusing to allow Father to take a third deposition of Mother, and disallowing a deposition of Dr. Flens.

To support his argument, Father relies on *Tenent v. Tenent*, No. 02A01-9305-CV-0017, 1994 WL 317531 (Tenn. Ct. App. July 6, 1994). *Tenent* involved a husband who committed perjury during the course of divorce proceedings. *Tenent*, 1994 WL 317531, at *1. Due to the husband's perjury, the trial court prohibited him from "testifying, cross-examining witnesses, presenting witnesses in his own behalf, or participating in the trial in any manner." *Id.* This court concluded that, although the husband's perjury was "repulsive," due process required that he be permitted to participate in the proceedings and cross-examine witnesses. *Id.* at *4.

The facts in *Tenent* are distinguishable from those in this case. The trial court did limit Father's cross-examination of Ms. Ross when he attempted to impeach her about the confession she testified he forced her to write. Specifically, the trial court prohibited Father from cross-examining Ms. Ross about whether the statements in the confession were true. The court based its decision on a finding that Father was harassing the witness by attempting to embarrass her. In regard to Dr. Flens, the record shows that the trial court disallowed the introduction of his deposition into evidence. This occurred after the trial court had already heard live testimony from Dr. Flens earlier in the trial. Thus, unlike in *Tenent*, Father was not completely barred from participating in the trial, from introducing evidence, or from cross-examining witnesses. This argument is without merit.

In regard to Father's assertion that the trial court violated his due process rights by conducting the trial over a period of two years, the record shows that Mother's proof took approximately a day-and-a-half. The rest of the two-year period was consumed by Father's proof and numerous motions. On several occasions, the trial court admonished him for delaying the proceedings. Father is the architect of his own misfortune. Consequently, the finger of blame points solely at him, not the trial court. This argument is without merit.

With respect to Father's assertion that the trial court violated his due process rights by preventing him from conducting the second deposition of Mother and by refusing to

allow a third deposition of Mother, Father again fails to cite to any legal authority to support his argument. These arguments are waived.

In light of the foregoing, we conclude that the trial court did not deprive Father of procedural due process.

### I. Unconstitutional Conditions on Father to See Noah

Father argues that the trial court erred in allowing Mother to choose a family therapist after Dr. Brown was removed from the case. He contends that the trial court, by allowing her to choose the family therapist, placed an unconstitutional condition on his ability to see his son because Father was denied "freedom of choice on medical providers." Father fails, however, to cite to any constitutional provision providing him that right, and this court is aware of none. This argument is without merit.

### J. Name Change

Father argues that the trial court erred in denying his request to change Noah's surname to "Justice." When a child is born to an unmarried mother, as in this case, the child's birth certificate "must reflect that the child's surname is that of the mother unless both parents have requested otherwise." *Barabas v. Rogers*, 868 S.W.2d 283, 287 (Tenn. Ct. App. 1993) (citing Tenn. Code Ann. § 68-3-305(b)(1)). The surname of a nonmarital child "is not changed following a paternity or legitimation proceeding unless the court orders that the name be changed." *Id.* A court should not change a child's surname unless it is in the best interest of the child. *Halloran v. Kostka*, 778 S.W.2d 454, 456 (Tenn. Ct. App. 1988). As the party seeking to change the child's surname, Father bears the burden of proving the change is in the child's best interest. *Barabas*, 868 S.W.2d at 287.

When determining whether changing a child's surname is in the child's best interest, courts consider the following criteria:

> (1) the child's preference, (2) the change's potential effect on the child's relationship with each parent[,] (3) the length of time the child has had its present surname, (4) the degree of community respect associated with the present and proposed surname, and (5) the difficulty, harassment, or embarrassment that the child may experience from bearing either its present or its proposed surname.

*Id.*

A thorough examination of the record shows that Dr. Toor testified that Noah prefers his current surname, and Mother and the school personnel testified that his present surname is respected in the community. Moreover, at the time of trial, Noah had held his

present surname for over eleven years. The record contains no proof regarding the second and fifth criteria.

In light of the foregoing, we conclude that Father failed to prove it was in Noah's best interest to change his surname. Thus, the trial court did not err in denying Father's request to change Noah's surname to "Justice."

K. Parenting Plan

1. Primary Residential Parent

Father asserts that the trial court erred in designating Mother as the primary residential parent and entering a residential parenting schedule that severely restricts his parenting time with Noah. Father contends that the evidence in the record does not support the findings of fact cited by the trial court when making its parenting plan determination.

When a court fashions a parenting plan, the best interest of the child is the paramount concern with the needs of the parents being secondary. *Barnes*, 2012 WL 5266382, at *6. "[T]he goal is to place the child in the environment that best serves his or her needs." *Id.* Tennessee Code Annotated section 36-6-401(a) provides, in pertinent part:

> The general assembly recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests. The best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care.

A court tasked with fashioning a parenting plan should consider the factors set forth in Tenn. Code Ann. § 36-6-106(a). These factors are as follows:

> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;
>
> (2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and

continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . ;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. . . ;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a).  Additionally, a court "shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with" the best interest of the child.  *Id.*

In the present case, the trial court made an exhaustive review of the relevant factors and found they weighed in favor of naming Mother the primary residential parent. First, the trial court found that Mother "has provided for Noah's needs throughout his life" while Father "has an estranged relationship with Noah."  *See* Tenn. Code Ann. § 36-6-106(a)(1).  The trial court also found that Mother has always been the primary caregiver.  *See* Tenn. Code Ann. § 36-6-106(a)(5).  Regarding Noah's emotional and developmental needs, the court found that Mother had been the one to provide for those needs.  *See* Tenn. Code Ann.§ 36-6-106(a)(7).  The court considered each party's ability to parent the child and found that Mother is "morally, physically, mentally and emotionally fit to parent the child," but there are "serious concerns about the moral, mental and emotional fitness of [Father] to parent the child."  *See* Tenn. Code Ann. § 36-6-106(a)(8).  The court then found that Noah is in a stable environment that has been provided by Mother since his birth.  *See* Tenn. Code Ann. § 36-6-106(a)(10).

The evidence in the record supports these findings.  Mother testified that she has been the one to care for Noah and provide for his needs on a daily basis.  She has taken him to most of his medical appointments as well as his therapy appointments.[8]  There can be no genuine dispute that Mother is and always has been Noah's primary caregiver. Moreover, the record shows that Noah lives with Mother in a home she shares with Mr. Bodine, who gets along well with Noah.

In addition to the factors already discussed, the trial court also considered two additional factors.  Father focuses on these two factors to contend that the evidence in the record does not support the court's findings.  The court considered each parent's willingness to facilitate a close relationship with the other parent and found that Mother "has attempted numerous times to promote a positive relationship between Noah and [Father]," whereas "[t]here is no doubt, based on [Father's] actions, he is not willing to encourage a close relationship between Noah and [Mother]."  *See* Tenn. Code Ann. § 36-6-106(a)(2).  Father argues that the evidence in the record contradicts this finding because Mother sabotaged his relationship with Noah by alienating Noah from him.

---

[8] The maternal grandmother has sometimes taken Noah to his various medical and therapy appointments.

The trial court considered the testimony presented by Father regarding parental alienation and made findings of fact relating to that evidence. The court found that Mother had not persistently rejected or denigrated Father to the extent it reached the level of a parental alienation campaign because Mother voluntarily expanded Father's parenting time during the pendency of the case. Moreover, the court found credible Mother's statement that she did not influence Noah's negative feelings towards Father. Finally, the court found that the estrangement between Father and Noah was due to the conduct of Father, not Mother.

Contrary to Father's assertions, the evidence in the record supports these findings. Mother testified that she expanded Father's parenting time both before and after litigation resumed in 2013. Most notably, she allowed Father several additional supervised visits without the court ordering her to do so. She wants Noah to have a close relationship with Father and has even encouraged Noah to call Father. The only evidence presented of alienating conduct by Mother was her discussing with Noah some of the information she disclosed to Father during discovery.

The record shows alienating conduct by Father. For instance, despite Dr. Brown advising him to dismiss the separate lawsuits against Mother, he repeatedly refused to do so. Although he did eventually dismiss the lawsuits, he dismissed them without prejudice, meaning he could refile them at a later date. Finally, to prove Mother is guilty of parental alienation, Father relies on the testimony of Dr. Workman, Dr. Rappaport, and Dr. Flens. The trial court did not find any of this evidence credible, however, because these experts based their conclusions on information provided by Father, whom the court found not credible.

The final factor considered by the trial court that Father contends was not supported by the evidence was whether there was evidence of physical or emotional abuse to the child, to the other parent or to anyone else. *See* Tenn. Code Ann. § 36-6-106(a)(11). The court found that Father "has been abusive, both physically and psychologically to [Mother] as well as psychologically abusive to the child." Evidence in the record shows that Father has a history of physical and mental abuse towards Mother as well as Ms. Ross. Mother testified that he raped her and made her feel like she was untrustworthy. Although Ms. Ross did not expressly state Father raped her, she testified that she never felt she could say no when he wanted to engage in sexual relations because she did not want to anger him. Additionally, she testified that Father forced her to write a confession detailing perceived wrongful acts and relinquishing her rights to her unborn child.

In regard to psychological abuse of Noah, the record shows that Father videotaped visits with Noah on numerous occasions using hidden cameras, interrogated Noah about Dr. Nordquist, and admonished Noah about his fears of Father kidnapping him after the issue had already been handled in family therapy with Dr. Hanaway. These acts by

Father are disturbing, but the evidence we find most abhorrent is Dr. Nordquist's testimony that Father threatened Noah that he would have Mother put in jail.

In light of the foregoing, we conclude that the evidence does not preponderate against the trial court's findings. We affirm the trial court's designation of Mother as the primary residential parent.

### 2. Residential schedule

Father next argues that the trial court erred in limiting his parenting time with Noah. Prior to fashioning a residential parenting schedule, courts must determine if either parent has been involved in any of the misconduct specified in Tenn. Code Ann. § 36-6-406, which would necessitate that the court limit the parent's residential parenting time. *Armbrister*, 414 S.W.3d at 696. The specified misconduct includes the following:

(1) A parent's neglect or substantial nonperformance of parenting responsibilities;

(2) An emotional or physical impairment that interferes with the parent's performance of parenting responsibilities as defined in § 36-6-402;

(3) An impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting responsibilities;

(4) The absence or substantial impairment of emotional ties between the parent and the child;

(5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development;

(6) A parent has withheld from the other parent access to the child for a protracted period without good cause;

(7) A parent's criminal convictions as they relate to such parent's ability to parent or to the welfare of the child; or

(8) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

Tenn. Code Ann. § 36-6-406(d).

In the present case, the trial court determined that Father had engaged in misconduct that necessitated limiting his residential parenting time. The trial court made the following findings of fact:

1. *The absence or substantial impairment of emotional ties between the parent and the child.*

[Father] has been estranged from Noah for a number years and there is limit[ed] proof of emotional ties between [Father] and the child. [Father] has done little to address his issues in regard to the estrangement.

2. *The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development.*

[Father] continues to have a conflict with the minor child. This conflict has continued for a number of years. There were several instances of [Father's] efforts to hyper-control Noah.

3. *Such other factors or conduct as the court expressly finds adverse to the best interests of the child.*

[T]his Court finds [Father] not credible. He has exhibited a pattern of manipulation, over-controlling and bullying in his life. This Court has serious concerns about his ability to parent since over the three years this Court has been assigned to this matter he continues this previously-established pattern. These events include but are not limited to the following:

- [Father's] prior abusive treatment of [Mother]
- [Father] forced his ex-wife to prepare a "confession" while she was pregnant with his child (who subsequently died at birth).
- [Father] sued Dr. Nordquist for malpractice.
- [Father] sued [Mother] seeking to have her removed as Circuit Court Clerk.
- [Father] sued [Mother] and her husband for an obscene gesture by [Mr. Bodine] in a parking lot after the child's ballgame.
- [Father's] associate, Mr. Rickman, served [Mother's] mother during supervised parenting time at McDonald's.
- [Father] secretly recorded visits at McDonald's on numerous occasions.
- [Father] manipulated Dr. Brown to allow individual collateral therapy when such was not ordered by the Court.

- [Father] bullied and harassed Dr. Hanaway, through taking his deposition, until he removed himself from the case.
- Issues with Federal Court regarding [Father's] truthfulness.
- [Father] threatened to sue therapist Sara Littlefield.
- After she brought this lawsuit regarding parenting time, [Father] threatened to "break [Mother] financially."
- Two counselors advised [Father] to dismiss the lawsuits; he nonsuited both.

The evidence in the record shows that, for several years, Noah did not want to spend time alone with Father—even after three years of family therapy. As previously discussed, Father physically and mentally abused both Mother and Ms. Ross. Moreover, he has used the legal system to bully and intimidate people associated with this case. For instance, he has sued Mother, Mr. Bodine, and Dr. Nordquist. He reported the maternal grandmother to DCS for nudging Noah with her foot during a supervised visit at McDonald's. When Dr. Hanaway refused to do something Father wanted him to do, Father threatened to depose him and subpoena him to court. After a thorough examination of the record, we conclude that the evidence does not preponderate against the trial court's findings. As the trial court stated, Father has engaged in "a pattern of manipulation, over-controlling and bullying." Thus, the trial court did not abuse its discretion in limiting Father's residential parenting time with the child.

L. Child Support

Father contends that the trial court erred in setting his income for child support purposes at $17,785.83. Specifically, he asserts that the trial court erred in only considering one year of income rather than "three years of income, as is standard and appropriate" and in failing to take into account the self-employment taxes Father has to pay. He also asserts that the trial court should have required Mother to produce her tax returns rather than only requiring her to produce her W-2s. Father's brief fails to make any citation to the record. Moreover, he fails to cite to authority supporting his argument. Thus, he has waived this argument.

M. Dismissal of Contempt Charges

Father next asserts that the trial court erred in dismissing the petition and amended petition for criminal contempt he filed against Mother. Some history is necessary to understand Father's position. After the trial court entered its September 13, 2013 order restricting Father's parenting time to two hours of supervised visitation per week, he filed an interlocutory appeal in this court. The trial court stayed its September 13, 2013 order pending this court's ruling on Father's application for permission to appeal.

In November 2013, this court ordered the parties to "immediately abide by whatever co-parenting plan was in effect prior to the entry of the September 13, 2013 order" because the trial court's order was stayed until we determined whether to grant Father's application. Mother, however, continued to only permit Father to exercise parenting time with Noah as provided in the September 13, 2013 order. We ultimately denied Father's application for permission to appeal. Thereafter, Father filed a petition for criminal contempt and an amended petition for criminal contempt against Mother for repeatedly violating the 2010 parenting plan, which Father asserted this court had ordered the parties to follow.

The trial court entered an order on April 12, 2015, dismissing Father's petition and amended petition for contempt after concluding that he had not proven beyond a reasonable doubt that Mother willfully violated this court's order. The court based this conclusion on its finding that there was an ambiguity on the face of this court's order. Specifically, there was confusion as to which parenting plan "was in effect" prior to the September 13, 2013 order—the 2006 plan or the 2010 plan.

On appeal, Father argues that his petition and amended petition for criminal contempt should not have been dismissed because there is no ambiguity in this court's order: the 2010 plan was clearly the plan in effect because that is the plan the parties followed prior to the September 13, 2013 order. In response, Mother asserts that Father failed to prove beyond a reasonable doubt that she was guilty of criminal contempt and that the double jeopardy clause of the Fifth Amendment to the United States Constitution precludes this court from reviewing the issue. We agree with Mother.

With respect to criminal contempt and the double jeopardy clause, this court recently stated, in pertinent part, as follows:

"Although contempt proceedings are traditionally classified as 'civil' or 'criminal,' in point of fact, contempt proceedings are neither wholly civil nor criminal in nature and may partake of the characteristics of both." *Baker v. State*, 417 S.W.3d 428, 435 (Tenn. 2013). Because criminal contempt has both civil and criminal elements, defendants in criminal contempt proceedings are afforded some, but not all, of the same constitutional protections as criminal defendants. *Id.* at 436. Our Supreme Court has held that the double jeopardy clause of the Fifth Amendment to the U.S. Constitution is one of the protections afforded to defendants in criminal contempt proceedings. *Ahern v. Ahern*, 15 S.W.3d 73, 80 (Tenn. 2000). The double jeopardy clause "protects an accused against a second prosecution for the same offense after an acquittal, and multiple punishments for the same offense." *Id.* "Perhaps the most fundamental rule in the history of double jeopardy jurisprudence has been that '[a] verdict of acquittal . . . could not be reviewed, on error or otherwise, without putting

- 37 -

(a defendant) twice in jeopardy, and thereby violating the Constitution.'" *U.S. v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977) (quoting *United States v. Ball*, 163 U.S. 662, 671 (1896)); *see Cansler v. Cansler*, No. E2008-01125-COA-R3-CV, 2010 WL 342652, at *7 (Tenn. Ct. App. Feb. 1, 2010).

*Covarrubias v. Baker*, No. E2016-02316-COA-R3-CV, 2017 WL 6276230, at *2 (Tenn. Ct. App. Dec. 11, 2017). The *Covarrubias* court concluded that reviewing the trial court's decision to dismiss the wife's motion for criminal contempt would violate the double jeopardy clause because the dismissal functioned as an acquittal. *Id.*

Here, the trial court held a hearing on Father's petition and amended petition for criminal contempt where both he and Mother presented evidence. After hearing all of the evidence, the trial court concluded that Father failed to prove beyond a reasonable doubt that Mother was guilty of criminal contempt and dismissed the petition and amended petition for criminal contempt. In light of our holding in *Covarrubias*, we conclude that the trial court's dismissal "functioned as an acquittal for the purposes of double jeopardy." *Id.* Thus, we cannot review the trial court's dismissal because to do so would violate the Constitution.

### N. Fifth Amendment Privilege

While the criminal contempt charges were pending, Father sought to take a second deposition of Mother. During the deposition, she repeatedly invoked her privilege against self-incrimination. Father asserts that she waived this privilege, however, by voluntarily disclosing incriminating facts. This issue is related to the previous section. Because we determined that we cannot review the trial court's dismissal of Father's petition and amended petition for criminal contempt, this issue is moot.

### O. Wrongful Injunction

Father argues that the trial court erred in not addressing the September 13, 2013 order limiting Father's parenting time to two hours of supervised visitation per week. Specifically, Father argues that he proved that the injunction was wrongfully issued so the trial court should have conducted proceedings to determine the losses caused by the wrongfully issued injunction and execution on the bond. Father fails to cite to where in the record he proved that the injunction was wrongfully issued. This issue is waived.

P. Attorney Fees

1. At Trial

At the conclusion of trial on March 30, 2017, the trial court ruled from the bench that Father would pay all of Mother's attorney fees incurred as a result of her petition to establish paternity. In its April 11, 2017 order, the trial court reiterated this ruling and awarded Mother $376,638.90 in attorney fees. On appeal, Father asserts that the trial court erred in awarding Mother her attorney fees without allowing him to cross-examine Mother's witnesses or present proof on that issue.

In *Wilson Management Co. v. Star Distributors Co.*, 745 S.W.2d 870, 873 (Tenn. 1988), the Tennessee Supreme Court stated:

> [W]e agree with *Trice* [*v. Hewgley*, 381 S.W.2d 589 (Tenn. Ct. App. 1964)] that a trial judge may fix the fees of lawyers in causes pending or which have been determined by the court, with or without expert testimony of lawyers and with or without a prima facie showing by plaintiffs of what a reasonable fee would be. Obviously, the burden of proof on the question of what is a reasonable fee in any case is upon the plaintiff and plaintiff should be in a position to tender such proof. However, if a trial judge is prepared to fix a reasonable fee based upon the appropriate guidelines without first hearing plaintiff's proof, defendant must be accorded full opportunity to cross examine plaintiff's witness and present evidence on that issue.

In the present case, a thorough review of the record reveals that the trial court based its decision on affidavits submitted by Mother's attorneys stating she incurred attorney fees in the amount of $376,638.90.[9] Obviously, the trial judge felt he did not need opinions of other lawyers to make a proper award of attorney fees. At such point, "it was incumbent upon [Father's] lawyer to request a hearing if dissatisfied with the award, or convince the appellate courts that he was denied the opportunity to do so through no fault of his own." *Kahn v. Kahn*, 756 S.W.2d 685, 697 (Tenn. 1988).

On March 31, 2017, Father filed an objection to the award of Mother's attorney fees and requested a hearing on the matter. He amended his objection on April 10, 2017. Thereafter, the trial court advised Father that a hearing was set for April 28, 2017, on all pending motions, including attorney fees. Instead of waiting for the attorney fees issue to be heard on April 28, 2017, however, Father filed his notice of appeal on April 17, 2017, and he did not appear at the April 28 hearing.

---

[9] Martha Meares's fee totaled $232,847.50. David Valone's fee totaled $143,791.40.

In light of these facts, we conclude that Father was not denied an opportunity to cross-examine Mother's witnesses or present evidence regarding the award of attorney fees. We affirm the award of attorney fees.

### 2. On Appeal

Mother requests that she be awarded her attorney fees on appeal. Litigants are generally required to pay their own attorney fees unless a statute or contract provision provides otherwise. *John Kohl & Co. P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998). In custody cases, Tenn. Code Ann. § 36-5-103(c) provides a basis for an award of attorney fees at trial and on appeal. When this case was initiated, Tenn. Code Ann. § 36-5-103(c)[10] provided as follows:

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

A decision to award attorney fees on appeal, however, is within the discretion of the appellate court. *Paschedag v. Paschedag*, No. M2016-00864-COA-R3-CV, 2017 WL 2365014, at *5 (Tenn. Ct. App. May 31, 2017). Mother has prevailed on every issue on appeal, and Father's brief is largely a compilation of conclusory statements with little actual argument or citation to authority. As such, we exercise our discretion to award Mother her attorney fees incurred on appeal.

---

[10] Tennessee Code Annotated section 36-5-103(c) was amended in July 2018 to provide the following:

> A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the non-prevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

## IV. CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded for a determination of Mother's attorney fees incurred on appeal. Costs of appeal are assessed against the appellant, Loring E. Justice, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE